## AFFIDAVIT IN SUPPORT OF
## A CRIMINAL COMPLAINT AND ARREST WARRANTS

I, David J. Spirito, Task Force Officer ("TFO") with the United States Drug Enforcement Administration ("DEA"), being duly sworn, depose and state as follows:

### Introduction and Agent Background

1.      I am an investigative or law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.  As a DEA TFO, I am authorized to investigate violations of the laws of the United States, including violations of the federal drug laws in Title 21.

2.      I am employed by the Newton Police Department, where I have worked since 2000. I am currently assigned to the Detective Bureau.  Since 2011, I have been assigned to the Boston Office of the New England Division of the DEA as a Task Force Officer ("TFO").  I am currently assigned to the Organized Crime Drug Enforcement Task Force Boston Strike Force, which is a strike force incorporating various law enforcement agencies, including DEA, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), the Federal Bureau of Investigation ("FBI"), Immigration and Customs Enforcement Homeland Security Investigations ("HSI"), and the U.S. Marshals Service ("USMS"), among other agencies.  I am a graduate of the Massachusetts Criminal Justice Training Council ("MCJTC") Police Academy (1st Municipal Police Officers Class, Weymouth, Massachusetts).

3.      As a DEA Task Force Officer, I am authorized to investigate violations of the laws of the United States, including violations of federal narcotics laws in Title 21 of the United States Code.  I have received training regarding narcotics investigations while attending the Police

Academy.  I also have attended additional specialized training courses in furtherance of my past and current assignments.

4.      I have written and/or participated in the execution of numerous search warrants resulting in the seizure of large quantities of controlled substances and paraphernalia involved in the manufacture and distribution of controlled substances, United States currency, records of narcotics and monetary transactions, drug customer lists and other documents relating to the manufacturing, transportation, ordering, purchasing and distribution of controlled substances as well as the collection, expenditure, accounting, transportation, and laundering of drug proceeds.  I have participated in the debriefing of numerous defendants, informants, and witnesses who had personal knowledge regarding large-scale narcotics trafficking organizations.

5.      I have participated in all aspects of drug, organized crime, and gang investigations including conducting surveillance, executing searches pursuant to court-ordered search warrants, executing arrests, and participating in court-authorized Title III wiretaps of cellular telephones.  I have received extensive specialized training in the fields of gangs, organized crime, and controlled substance identification, investigation, and enforcement.

6.      As a result of my training and experience, I am familiar with the methods, routines, and practices of individuals involved in the use, sale, and trafficking of narcotics.  I am also familiar with the various paraphernalia used to manufacture, compound, process, deliver, and dispense, import and export, and use controlled substances such as heroin, cocaine, marijuana, prescription medication, and others.

7.      Based on my training and experience, I am familiar with the methods of operation employed by drug traffickers operating at the local, state, national and international levels, including those involving the distribution, storage, and transportation of controlled substances and

the collection of money that constitutes the proceeds of drug-trafficking activities.  Specifically, I am familiar with the manner in which drug traffickers use vehicles, common carriers, mail and private delivery services, and a variety of other means to transport and distribute drugs and the proceeds of drug trafficking.  I am familiar with the manner in which drug traffickers often store drugs and drug proceeds in storage sites commonly referred to as "stash houses."

8.     Based on my training and experience, I am aware that drug traffickers commonly use cellular telephones to communicate and further their drug-trafficking activities.  However, drug traffickers are aware of law enforcement's use of electronic surveillance, and thus frequently endeavor to thwart detection by changing cellular telephone numbers, using multiple cellular phones at the same time, and/or utilizing prepaid cellular phones where the user of the phone is not required to provide personal identifying information.  I am also aware that drug traffickers frequently "drop" or change cellular telephone numbers and cellular telephones in an effort to thwart law enforcement's use of electronic surveillance.  I am familiar with the manner in which drug traffickers use coded, veiled, or slang-filled language when discussing their illegal business, in an effort to prevent detection, and that they often use text messages in lieu of phone calls to avoid speaking over the telephone.  I am also familiar with the "street" language used by drug traffickers, as well as the methods they use to disguise conversations and operations.  I am additionally familiar with the manner in which drug traffickers use electronic text messages in lieu of or in addition to telephone calls.  Additionally, I am aware that drug traffickers and money launderers frequently use encrypted phone applications, including WhatsApp and FaceTime, in an effort to evade law enforcement scrutiny when communicating about their illegal activity.  Furthermore, I am aware that drug traffickers secrete records relating to income from controlled substances and expenditures of money and wealth, as well as documents indicating travel, and

3

evidence of financial transactions in secure locations within their cell phones, computers, residence, businesses, and/or other locations and devices, and use other means to facilitate, disguise, and conceal their illegal activities.

## Probable Cause for Complaint and Arrest Warrants

9.      This affidavit is submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging Jasdrual PEREZ ("PEREZ") ████████████ ████████ with a violation of Title 21, United States Code, § 846 (conspiracy to distribute and to possess with intent to distribute controlled substances), and in particular, with conspiring with each other and with other persons known and unknown to knowingly and intentionally distribute and possess with intent to distribute 400 grams or more of a mixture and substance containing a detectible amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide, also known as fentanyl, a Schedule II controlled substance  Accordingly, it does not contain every detail that I and other law enforcement officers have learned during the course of this investigation, but only facts sufficient to establish probable cause in support of a criminal complaint and arrest warrants.

10.      I have personally participated in the investigation of PEREZ, ████████████ and the PEREZ drug trafficking organization ("DTO") since September 2019.  The facts in this affidavit come from my personal observations, my training and experience, physical and video surveillance, tracking location of vehicles and cellular telephones, information obtained from a confidential sources, and information obtained from other agents and witnesses.  Since approximately May 2021, investigators have obtained additional information about the PEREZ DTO through ████████████████████████████████████████████.

11.      Since September 2019, investigators have been investigating the PERE DTO.  As a result of this investigation, agents have received ████████████████████████ used

4

by PEREZ ███████████, conducted significant physical and electronic surveillance of the target subjects, obtained precise location information for phones used by PEREZ, ███████, and other target subjects, analyzed toll records, obtained GPS location data for vehicles used by PEREZ and other target subjects, obtained information from confidential sources and made drug seizures. The evidence shows that PEREZ, ██████████, and others involved in the PEREZ DTO are distributing large quantities of controlled substances, including fentanyl pills to customers in numerous locations, including Massachusetts, Rhode Island and New York. Based upon our training, experience and familiarity with this investigation, investigators believe that PEREZ and his DTO have a significant customer base throughout Massachusetts.  For example, a number of Perez's customers have phone numbers with Massachusetts area codes.

12.     Furthermore, throughout this affidavit, quotations from intercepted conversations are derived from preliminary draft transcripts and/or synopses ("line sheets") of conversations that occurred primarily in Spanish. The line sheets are subject to revision upon finalization. Interceptions of these calls are based on my training and experience, the training and experience of other investigators, my involvement in this investigation, and in some cases, subsequent events. Additionally, the interpretations herein are based upon real-time summaries of interceptions of communications and are agents' interpretations of these calls in real-time.  All times set forth herein are approximate.

13.     Over the last several years, the DEA Strike Force in Boston has engaged in an investigation of controlled substances trafficked from Rhode Island to other parts of New England, including Massachusetts.  Based on my training, experience, and familiarity with this investigation, I believe that PEREZ is the leader of a drug trafficking organization ("DTO") based in Providence, Rhode Island, and that PEREZ conspired with numerous individuals, including but

not limited to ████████████ to commit controlled substances violations by (among other things) distributing counterfeit pills containing fentanyl in Massachusetts, Rhode Island, and New York.

14.    Based on my training, experience, and familiarity with this investigation, I am aware that PEREZ resides at 141 Alpine Estates Drive in Cranston, Rhode Island ("141 Alpine Estates"), that ████████████ resides at ████████████████ Providence, Rhode Island ████ ████████ ), and that PEREZ owns the residence located at 21 Imera Avenue in Providence, Rhode Island ("21 Imera Avenue").

<u>PEREZ DTO's Use of ████████████████████████</u>

15.    Based on a review of records kept by the City of Providence Assessors Office, ████ ████████████████████████████████████. Based on information obtained from National Grid (a utilities provider), the electrical utilities for ████████████████ are subscribed to ████████████████████ ). By January 2021, investigators began seeing PEREZ meeting with individuals at and going in and out ████████████████. For example, on January 15, 2021, I observed PEREZ at ████████████████ operating a vehicle registered to Kennyan Arias (PEREZ's sister) with registration address 141 Alpine Estates Drive (PEREZ's residence); while there, PEREZ spoke with individuals entering and exiting ████████████████ and later exited his vehicle to walk down the driveway for ████████████████ move another vehicle that had been parked onto the street, and then backed his vehicle down the driveway and parked it there.

16.    On February 4, 2021, at approximately 2:30 p.m., I observed PEREZ arrive at ████ ████████████████ and enter the residence. At approximately 2:50 p.m., a man (later identified as ████████ exited ████████████████, looked around, and then discarded items into a trash receptacle in front of the residence. Just after 4:00 p.m., I saw PEREZ exit ████████████████ and depart the area.

17.     Early the next morning (February 5, 2021) at approximately 6:00 a.m., I along with other investigators observed three separate trash/recycling containers on the street in front of ███ ███.   Shortly thereafter I obtained all plastic trash bags contained within those three trash/recycling containers.   Upon subsequent examination of the contents of those plastic trash bags, investigators found: one clear plastic bag containing blue powder; another clear plastic bag containing seven blue tablets bearing the imprint "A/215"; and several additional clear plastic bags containing a white powder residue.   Based on my training and experience, I recognized the shape and imprint on the blue pills as consistent with the pharmaceutical identifier for Oxycodone Hydrochloride 30 milligram pills; furthermore, I am aware that drug traffickers frequently press other opioids (including fentanyl and heroin) with colored binding agent into pill form to closely resemble pharmaceutical-grade pills.   Both the blue powder and one of the blue pills were field tested using an electronic hand-held narcotics analyzer; both tested positive for the presence of fentanyl.   Laboratory results for the powder showed it contained fentanyl.

18.     On February 19, 2021, investigators conducting surveillance observed a pick-up truck arrive in the area of ███████ and stop across the street.   The same vehicle had been observed at ███████ on January 14, 2021, and had appeared to be involved in a suspected drug transaction on that occasion.   Investigators saw a male (who had previously been seen exiting the side door of ███████) approach the pick-up truck and speak with the driver (a white male who was subsequently identified).   The driver parked and exited the vehicle; the two men entered ███████ together via the side door.   Approximately ten minutes later, both men exited from the same door and the white male entered the pick-up truck and left the area.

19.     A law enforcement officer subsequently conducted a motor vehicle stop on the pick-up truck after observing two traffic violations.  Investigators determined that the operator, hereinafter confidential source 4 ("CS-4"), was found to be in possession of approximately one-eighth of an ounce of suspected cocaine.[1]  That substance was subsequently field tested and tested positive for the presence of cocaine.  CS-4 agreed to be interviewed by investigators.  CS-4 told investigators that the cocaine was purchased from an individual known to CS-4 as ███  CS-4 described meeting with ███ at a yellow house with a front porch and a chain link fence on the side.  Based on my training and experience, that description matches the house at ███████.  CS-4 described the house as located near ████████; based on my familiarity with this investigation, that location is likewise consistent with the house at ███████.  CS-4 described ███ as a Dominican male, approximately 25 years old, approximately 6 feet tall and two-hundred and eighty pounds.  CS-4 told investigators that on this particular occasion, CS-4 met with ███ inside of ███████.  I subsequently showed CS-4 an unmarked photograph of ███████ and CS-4 recognized the photograph as depicting the person known to CS-4 as ███ and the person from whom CS-4 had purchased cocaine at ███████ on February 19, 2021.

20.     On April 29, 2021, at approximately 5:40 a.m., I along with other investigators observed three separate trash/recycling containers on the street in front of ███████

---

[1] Investigators obtained information about ███████ from CS-4.  I am aware of the true name of CS-4 but am not publicly disclosing it at this time in order to protect CS-4 from retaliation and because public disclosure at this time might jeopardize the ongoing investigation.  CS-4 does not have a criminal record.  CS-4 began cooperating with law enforcement in 2021.  CS-4 agreed to work with the DEA in the hope of receiving leniency with respect to possible drug charges, and as a result CS-4 has not been charged.  Information provided by CS-4 is believed to be reliable.

Shortly thereafter I obtained several paper and plastic bags contained within those three trash/recycling containers. Upon subsequent examination of the contents of those plastic trash, I located one clear plastic bag containing blue colored fragments consistent with broken tablets (which field tested positive for fentanyl) and a clear sandwich bag containing white powder residue (which field tested positive for cocaine). I also found another clear plastic bag with white powder residue that field tested positive for Inositol (based on my training and experience, I am aware that drug distributors often use Inositol as an adulterant). Laboratory analysis remains pending.

21.     On May 25, 2021, at approximately 4:20 p.m., investigators intercepted communications between ▮▮▮▮▮▮▮ and Miguel Ventura ("M. Ventura") ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮. Based on my training, experience, and familiarity with this investigation, I believe that M. Ventura directed ▮▮▮▮▮▮▮ to prepare for his arrival at ▮▮▮▮▮▮▮ ("Open the door, buddy"). Approximately seven minutes later, I observed M. Ventura and PEREZ arrive at ▮▮▮▮▮▮▮ in a 2011 black Cadillac SRX, bearing Rhode Island registration 1AE485. Both M. Ventura and PEREZ entered ▮▮▮▮▮▮▮ Approximately 75 minutes later, at 5:44 p.m., both M. Ventura and PEREZ exited ▮▮▮▮▮▮▮ and departed the area in the black Cadillac.

22.     On July 1, 2021, investigators conducting video surveillance of ▮▮▮▮▮▮▮ at approximately 6:15 p.m. observed ▮▮▮▮▮▮▮ exit the residence, walk to the front passenger window of a vehicle parked nearby, and conduct a suspected drug transaction with the driver. That vehicle departed, and then ▮▮▮▮▮▮▮ re-entered ▮▮▮▮▮▮▮. Roughly one hour later, PEREZ arrived at ▮▮▮▮▮▮▮ in a white Dodge Ram truck. Several minutes later, ▮ ▮▮▮▮▮▮▮ exited ▮▮▮▮▮▮▮ and got into the passenger side of the pickup truck. PEREZ then drove the truck with ▮▮▮▮▮▮▮ away from the residence. Based on video


surveillance, ▮▮▮▮▮ returned to ▮▮▮▮▮ in the white Dodge Ram truck at approximately 11:58 p.m. that evening.

23.    On July 18, 2021, at approximately 12:34 p.m., investigators conducting video surveillance observed PEREZ arrive back at ▮▮▮▮▮ in his white Dodge Ram.  He exited his vehicle and entered the residence.  Approximately six minutes later, PEREZ exited ▮▮ ▮▮▮▮▮ and departed in his truck.

24.    Based on my training, experience, and familiarity with this investigation, I believe that since at least February 2021, PEREZ, ▮▮▮▮▮ and the PEREZ DTO have been using ▮▮▮▮▮ as a location to manufacture, store, and distribute drugs in furtherance as part of an ongoing drug conspiracy.

<u>PEREZ DTO Sending Drugs into Massachusetts</u>

25.    In addition to obtaining evidence of the PEREZ DTO's activities in Rhode Island, investigators have obtained significant evidence that the PEREZ DTO's drug trafficking activities extend beyond Rhode Island and into Massachusetts (among other locations).  In particular, based on intercepted telephonic communications with individuals using Massachusetts-based area codes; precise location information to show PEREZ DTO-affiliated vehicles operating in Massachusetts, and surveillance of PEREZ DTO members travelling to Massachusetts for the purposes of conducting drug trafficking activities.

26.    For example, on July 27, 2021, investigators intercepted a series of communications between ▮▮▮▮▮ and ▮▮▮▮▮ ").

▮▮▮▮▮          So, that's what I'm saying.  Like it's like an hour ride or some shit.

               Rosin [phonetic], remember, Rosie [phonetic]?

▮▮▮▮▮          What was it?



███████████        Roslin [phonetic], Rosy [phonetic].

███████████        Roslin Mass.  Yeah, that was an hour . . .

27.     Based on my training, experience, and familiarity with this investigation, I believe that ███████████ asked ██████ to arrange transportation to deliver drugs to a customer near Roslindale, Massachusetts, and that they had previously made deliveries to the same address.  In another conversation, ███████ explained that his girlfriend would drive them to Massachusetts (████████: "I said Shorty just slid on . . . she just picked me up.").  At approximately 2:04 p.m., ███ ███████████ exited ███████████████ and got into the back seat of a silver 2008 Honda Accord. The Honda Accord drove from Providence, Rhode Island, into Massachusetts.

28.     At approximately 2:52 p.m., a Massachusetts State Trooper conducted a motor vehicle stop of the Honda Accord in Dedham, Massachusetts.  ███████████ girlfriend was driving. The registration for the vehicle had been suspended, and the car was towed.  Later that afternoon, investigators intercepted additional communications between ███████████ and ██████.  For example, they state in relevant part:

███████████        Yo, what kind of car she has?  A Honda?

███████████        Yeah.

███████████        Honda, gray, what year?

. . .

███████████        'Cause my man, the n****, he's got people that work there, he's

                   trying to see if he can and if they let him, he's gonna tell them he

                   left his gym bag in there and he's gonna try to grab that.

29.     Based on my training, experience, and familiarity with this investigation, I believe that ███████████ pressed ██████ to obtain additional details about his girlfriend's car in order to

accurately describe it and said "his man" had a plan to attempt to retrieve something from her vehicle at the tow lot.

30.     The next morning (July 28, 2021, at approximately 9:00 a.m.), investigators searched ███████ girlfriend's vehicle and located a plastic bag containing approximately 1,086 blue pills hidden in blue boxer briefs in the trunk of the Honda Accord.  The pills were marked with an "M" on one side and a "30" on the other, consistent with the imprint for 30-milligram oxycodone tablets.  One of the pills subsequently field tested positive for the presence of fentanyl.  The total weight (including the plastic bag) was approximately 125 grams.  Laboratory analysis remains pending. Later that day, investigators conducting video surveillance of ████████ Avenue observed PEREZ arrive there at approximately 11:19 a.m. and enter the residence.  Approximately twenty minutes later (at approximately 11:38 a.m.), PEREZ exited the residence carrying a brown paper bag which he placed in his vehicle and then drove from the area.  Roughly twenty minutes after PEREZ left ██████████ (at 12:06 p.m.), ██████████ exited the residence and walked in the same direction as PEREZ's vehicle.  At approximately 12:43 p.m., PEREZ's vehicle returned to ██████████, and ██████████ exited the vehicle and entered ██████████.  Several hours later, at approximately 4:49 p.m., PEREZ's vehicle again returned to ██████████.  Shortly after 5:00 p.m., ██████████ exited his residence and walked to the passenger side door and briefly leaned into the vehicle as if to speak with the driver before closing the door and returning to ██████████.  Finally, at approximately 9:01 p.m., the same vehicle PEREZ had been using earlier in the day returned yet again to ██ ██████████ Both ██████████ and ██████ M. Ventura exited ██████████ and went to PEREZ's vehicle.  After speaking with the operator from outside of the car, both entered another vehicle and left the area.  The vehicle believed to be used by PEREZ remained parked in

12

front of ████████████ until approximately 9:17 p.m.  Based on my training, experience, and familiarity with this investigation, I believe that PEREZ and ████████████ had ongoing communications throughout the day concerning the motor vehicle stop and the interdicted drug delivery in Massachusetts.

31.     The next day (July 29), investigators intercepted additional communications involving ████████████

32.     Based on my training, experience, and familiarity with this investigation, I believe that ████████████ was arranging for someone else to drive him to Massachusetts for a drug transaction.  At approximately 2:46 p.m., investigators observed a blue Ford Explorer arrive at ██ ████████████   ████████████ carrying a large black trash bag and a small white shopping bag, entered the vehicle.

33.     At approximately 3:27 p.m., investigators intercepted additional communications between ████████████ and ██████ discussing the July 27 car stop.  They stated in relevant part:

████████          Wow! We are so lucky my n****

████████████        Why? What happened?

████████          Bro, Shorty just hit me up and so her mom went to get the car.  Bro, they told her mom that they went back there with dogs and re-searched the car, my n****, and they found nothing.

34.     Based on my training, experience, and familiarity with this investigation, I believe ████████ told ████████████ that they were very lucky because Massachusetts State Troopers had searched the vehicle that had been stopped on July 27 but had not found anything.  Then, at approximately, 3:37 p.m., investigators observed the blue Ford Explorer at 276 Union Street in Providence, Rhode Island.  Based on my familiarity with this investigation, I believe that M.

13

Ventura then lived at 276 Union Street. Shortly thereafter, the blue Ford Explorer left the area. At approximately 5:20 p.m., investigators located the blue Ford Explorer near 24 Colgate Road in Roslindale, Massachusetts. Shortly thereafter, a gray Nissan arrived, and both ███████████ and the driver of the blue Ford Explorer entered the vehicle, which left the area. Based on my training, experience, and familiarity with this investigation, I believe that driver of the gray Nissan was the intended recipient of the suspected counterfeit fentanyl pills seized on July 27, 2021, and that the trip to Roslindale, Massachusetts, on July 29 was intended to replace the seized pills.

35.    On July 30, 2021, investigators intercepted additional communications in which █ ███████ spoke with ████████ girlfriend about the search of her vehicle. Based on my training, experience, and familiarity with this investigation, I believe that ██████████ expressed confusion that "we didn't get locked up for drugs" and surmised that the tow truck driver stole the drugs before the police searched the vehicle.

36.    Based on my training, experience, and familiarity with this investigation, I believe that while PEREZ, ████████████, and the PEREZ DTO generally are based in Providence, Rhode Island, drugs trafficked by the organization are distributed more broadly, including in Massachusetts.

<u>PEREZ Discusses His Drug Trafficking Organization</u>

37.    On January 19, 2022, at approximately 11:01 a.m., investigators intercepted a conversation between PEREZ and another man.[2]  During this conversation, PEREZ stated the following:

---

[2] The identity of this man is known to me but I am not disclosing it at this time.

PEREZ        Look at me dude, I'm tell you the truth. Old man, I wake up all bitter day
             every single day.  Dude, I'm gonna tell you: I have a big, a serious problem
             in the head. Dude, I sell drugs because I like this shit, dude. I'm not like I
             was before, because I don't wanna ended in jail, you understand me, dude?

Male 1       Try to [Voices Overlap]

PEREZ        But, listen... I'm telling you what it is, dude. Because it's like, I don't -- I
             don't see it [drugs], I don't touch it; I only touch the money because they
             have to give out the money. You understand me? But [Voices Overlap]

Male 1       No but sometimes, a fucking motherfucker gets in between due to jealousy.

PEREZ        You know what, I'm telling you the truth. I've been lucky, dude. Because I
             have same 10 guys, they are guys like… they are like…Guys like me, but
             they have good head like me.

Male 1       Yeah.

PEREZ        I am a badass.  I fill them up.  For example, I have 10 of them and this one
             give me 150, this other one give me another 150, and the other one give me
             200, the other one give me 300… I have big bills, so when I collect… For
             example, I may not receive payments for a whole month or a month and a
             half and its okay because I have resources.  When I collect that, it's like a
             million and some.  So, I really don't care what's going on with you?

Male 1       Yeah.

PEREZ        'Cause I made my capital, thanks to my God understand man?

Male 1       Yes.

PEREZ        So I add someone else that I somehow trust, who needs money, then I pay him good to keep him happy. And I'm making even more now.   You understand?

Male 1        Yes.

PEREZ        For example, let's say you give this houses away for 1 peso, especially when you have put so much work into it.  It's hard to let it go.

Male 1        Yeah, it's hard.

PEREZ        So, in other words I make a bit less but I'm at peace.  To tell you the truth, that is no longer my problem, dude.  The business part of it is all worked out, all worked out. Because I can very easy says, "All done." Another thing, I'm not out on the streets grinding no more, I do go out looking what else to do.  I'm like "What do I do now, what else, what else?"

38.    Based on my training, experience, and familiarity with this investigation, I believe that PEREZ explained that he engaged in drug trafficking because he enjoys making money ("Dude, I sell drugs because I like this shit, dude") but because he does not want to go to jail ("I don't wanna ended in jail") he keeps his distance from the drugs and keeps closer to the money ("Because it's like, I don't -- I don't see it [drugs], I don't touch it; I only touch the money because they have to give out the money.").  Based upon my training, experience and familiarity with the investigation, I believe that PEREZ told the man that he employs ten people to sell drugs on his behalf ("Because I have the same ten guys" and "I fill them up. For example, I have ten of them…") and that the people he employs are people PEREZ trusts and because PEREZ keeps paying them, the drug dealers will keep working for PEREZ and making PEREZ money ("So I add someone else that I somehow trust, who needs money, then I pay him good to keep him happy. And I'm

16

making even more now.").  I also believe that PEREZ also claimed he might go a month without receiving payments but when he does collect he might receive more than one million dollars ("For example, I may not receive payments for a whole month or a month and a half and its okay because I have resources.  When I collect that, it's like a million and some.").

<u>PEREZ and ███████████ Discuss a Drug Delivery for 21 Imera Avenue</u>

39.     On January 27, 2022, investigators intercepted communications between PEREZ and ███████████ at approximately 3:09 p.m.  They stated in relevant part:

| PEREZ | Can you bring it to me?  Or you don't feel good? |
| ██████████ | I just don't know right now bro. |
| PEREZ | And when the woman passed by . . . nothing weird was seen, bro? |
| ██████████ | No, it was good, it was early, she came early. |
| . . . | |
| ██████████ | Give me a little bit I see if I can see him in a little bit. |
| PEREZ | Thank you bro' . . . it is to go to the same guy, the same guy. |
| ██████████ | [affirms] |
| PEREZ | You don't know how long?  Because you know I have to check. |
| ██████████ | Give me an hour. |
| . . . | |
| PEREZ | I'll wait for you to bring you back. |
| ██████████ | Bro' shorty is here she's taking me; she's in the store right now. |

40.     Based on my training, experience, and familiarity with this investigation, including additional intercepted communications, I believe that PEREZ asked ███████████ to deliver drugs to him ("Can you bring it to me?") and wanted to know if the prior delivery to ███████████

17

went smoothly ("And when the woman passed by . . . nothing weird was seen, bro?"), and ▮

███████ indicated there were no issues ("Not it was good, it was early, she came early). I also

believe that after some additional back and forth, ███████ agreed to deliver the drugs to

PEREZ's stash location (21 Imera Avenue) in a short while ("Give me a little bit I see if I can see

him in a little bit"); that and PEREZ reminded ███████ it would go to the same person

("Thank you bro' . . . it is to go to the same guy, the same guy") and asked how much time ▮

███████ needed ("You don't know how long?"); and that ███████ estimated an hour

("Give me an hour"). Finally, I further believe that PEREZ offered to drive ███████ back

to his residence after ███████ delivered the drugs ("I'll wait for you to bring you back") but

███████ said his girlfriend would drive him there and back ("Bro' shorty is here she's taking

me").

41.    At approximately 3:32 p.m., investigators intercepted communications between

PEREZ and ██████████████ ). Based on my training, experience, and familiarity

with this investigation, I am aware that ███████ was living at 21 Imera Avenue. They stated in

relevant part:

     PEREZ        [H]e's gonna drop, he's gonna drop that gift for your daughter.  That's it.

     ███████     Who? Who?

     PEREZ        ███████

     ███████     Aight, aight . . . I'm not there so, my son's there.

     PEREZ        He said in an hour.

42.    Based on my training, experience, and familiarity with this investigation, I believe

that PEREZ told ███████ that ██████████████ would drop the drug sample off at

21 Imera ("[H]e's gonna drop, he's gonna drop that gift for your daughter"), and that ███████

18

said he was not at home but his son was ("I'm not there so, my son's there") and that PEREZ told ▮▮▮▮ he had an hour ("He said in an hour.").

43.     At approximately 5:02 p.m., investigators observed ▮▮▮▮ arrive at 21 Imera Avenue in a red Nissan registered to his girlfriend.  Investigators had previously observed the same vehicle at ▮▮▮▮ earlier that day.  ▮▮▮▮ walked to the front door of 21 Imera Avenue with a weighted blue plastic bag in hand.  The door opened for ▮▮▮▮ and he entered, exited approximately one minute later without the bag, and then departed in his girlfriend's car.  Based on my training, experience, and familiarity with this investigation, I believe that ▮▮▮▮ delivered the drugs to 21 Imera Avenue as previously arranged with PEREZ.

44.     At approximately 9:36 p.m., investigators intercepted communications between PEREZ and ▮▮▮▮ in which PEREZ told ▮▮▮▮, ". . . Your son bro, your son, alright, bye." Based on my training, experience, and familiarity with this investigation, I believe that PEREZ told ▮▮▮▮ that the drugs had been dropped off with ▮▮▮▮ son.  At approximately 9:42 p.m., PEREZ and another male entered 21 Imera Avenue.

45.     Later that evening, at approximately 10:44 p.m., investigators intercepted communications between PEREZ, ▮▮▮▮, and ▮▮▮▮ They stated in relevant part:



▮▮▮▮          That's it?

▮▮▮▮          I'll text you the addy right there.  There's mad white ones.

▮▮▮▮          Is he giving you something back?

▮▮▮▮          Na, na, he's not giving me nothing back . . . just drop it to him.

▮▮▮▮          Alright.

46.     Based on my training, experience, and familiarity with this investigation, I believe that  and PEREZ provided fentanyl pills to ███████ to deliver ("That's it"); that ███ agreed to send PEREZ the delivery address ("Ill text you the addy right there"); and that ██████ asked whether the buyer was paying for the pills ("Is he giving you something back?") but ███ told ██████ just to deliver them.

<u>Seizure of Counterfeit Fentanyl Pills, Pill Presses, and United States Currency</u>

47.     On February 6, 2022, just prior to 6:00 p.m., PEREZ and another male arrived at 21 Imera Avenue.  At around 6:30 p.m., investigators intercepted communications between PEREZ and his girlfriend Carolina Correa ("Correa"), in which Correa asked about ordering takeout food and what PEREZ was going to eat for dinner.  PEREZ responded, "I am working, Carolina; bye. Don't bother me so much; let me finish; okay."  Based on my training, experience, and familiarity with this investigation (including the results of the search warrants executed the following day), I believe that PEREZ told Correa to stop calling him while he was busy pressing counterfeit fentanyl pills ("I am working . . . Don't bother me so much; let me finish"). At that time, precise location information for PEREZ's telephone placed it in the area of 21 Imera Avenue. Based on video surveillance, investigators believe that PEREZ and the other male remained at 21 Imera Avenue until approximately 3:38 a.m. on February 7.

48.     At approximately 8:00 a.m. on February 7, 2022, investigators executed a federal search warrant for 21 Imera Avenue.  Investigators encountered an adult male along with a juvenile male at the residence.  During the search, investigators seized multiple marijuana plants from the garage.  Inside the house, investigators recovered two pill presses, a gallon-sized freezer bag of suspected counterfeit fentanyl pills, as well as additional powder in a bowl and other materials used in manufacturing pills.  From a bedroom, agents recovered additional pills which I believe to

be counterfeit fentanyl pills.   Based on my training, experience, and familiarity with this investigation, I estimate that investigators seized an approximately 50,000 suspected counterfeit fentanyl pills (weighing over approximately five kilograms) together with a mixture or substance that field tested positive for fentanyl also weighing over approximately five kilograms, for a total weight of over an estimated ten kilograms of a mixture and substance containing fentanyl.

49.   Investigators also executed a search warrant at PEREZ's residence (141 Alpine Estates Drive).  Among other items seized, investigators located approximately $80,000 in United States currency.  Based on intercepted communications, PEREZ learned of the search of 21 Imera Avenue at approximately 11:15 a.m.  Shortly thereafter, at approximately 11:24 a.m., investigators intercepted communications between PEREZ and Correa.  Based on my training, experience, and familiarity with this investigation, I believe that in summary, PEREZ told Correa that he is screwed and that the police came, that he has to hide, that he thought he was being followed, and instructed Correa to take something (specifically, "la cartera") and to leave.  Based upon my training, experience, and familiarity with the investigation, I believe that PEREZ told Correa to take an item from their residence (141 Alpine Estates Drive) and go elsewhere to avoid arrest and/or seizure of evidence and assets.  Shortly thereafter, investigators at 141 Alpine Estates observed Correa drive away from their residence and directly to ████████████ (where PEREZ's ████████ ████████).   Investigators determined that PEREZ drove his Dodge Ram truck from Providence, Rhode Island, to New York City, New York.  Based on my training, experience, and familiarity with this investigation, I believe that PEREZ fled from Providence, Rhode Island in an effort to evade arrest.

## Conclusion

50.    Based on the foregoing facts, there is probable cause to believe that from at least February 2021, through and including February 2022, PEREZ and ▮▮▮▮▮▮▮ conspired with each other and with other persons known and unknown to knowingly and intentionally distribute and possess with intent to distribute 400 grams or more of a mixture and substance containing a detectible amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide, also known as fentanyl, a Schedule II controlled substance.   Accordingly, I respectfully request that both a criminal complaint and an arrest warrant be issued.

Respectfully submitted,

David J. Spirito
Task Force Officer
Drug Enforcement Administration

Sworn to via telephone in accordance with Federal Rule of Criminal
Procedure 4.1 on February __11__, 2022

Hon. Donald L. Cabell
United States Magistrate Judge